Louis M. Parker FORD,
Petitioner–Appellant,

v.

Bill SEABOLD, Warden, Luther Luckett Correctional Complex, Respondent–Appellee.

No. 86–6275.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 8, 1987.

Decided March 7, 1988.

Rehearing and Rehearing En Banc Denied May 16, 1988.

Kevin M. McNally, argued, Asst. Public Advocate, M. Gail Robinson, Frankfort, Ky., for petitioner-appellant.

David L. Armstrong, Atty. Gen. of Kentucky, Frankfort, Ky., David A. Smith, argued, for respondent-appellee.

Before WELLFORD and GUY, Circuit Judges, and HARVEY, Senior District Judge.*

JAMES HARVEY, Senior District Judge.

Louis Ford appeals the decision of the district court denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth below, the judgment of the district court is affirmed.

## I.

Ford was convicted of capital murder in the beating and stabbing death of Suzanne Schick which occurred on September 11, 1980. At the time of the murder, Ford was an inmate at LaGrange Reformatory, but was housed in a dormitory in Frankfort and working as a "trusty" about the grounds of the capitol and the governor's mansion. Schick lived in an apartment directly across from the governor's mansion. Schick's body was discovered inside the hallway leading upstairs to her apartment. She had been stabbed repeatedly and her clothes had been torn away.

Ford was indicted by a grand jury in Franklin County, but because of the publicity surrounding Schick's murder, the venue was changed to Scott County. The jury found Ford guilty of murder, and Ford was sentenced to life imprisonment. His sentence was affirmed by the Kentucky Supreme Court. *Ford v. Commonwealth,* 665 S.W.2d 304 (1983), *cert. denied,* 469 U.S. 984, 105 S.Ct. 392, 83 L.Ed.2d 325 (1984). Ford then filed his petition for a writ of habeas corpus. The district court referred the petition to a United States Magistrate who recommended that the petition be denied. Ford filed timely objections to the magistrate's recommendation. The district court adopted the findings of fact and recommendation of the magistrate as the opinion of the court.

On appeal, Ford contends that his petition should be granted because: (1) his sixth amendment right was violated because the Scott County jury was selected from a pool in which women and young adults were underrepresented and college students excluded, and his sixth amend-

---

* The Honorable James Harvey, United States District Court for the Eastern District of Michigan, sitting by designation.

ment and fourteenth amendment right of equal protection were violated because for over ten years an insufficient number of women and no young adults were appointed to serve as a jury commissioner in Scott County; (2) his fourteenth amendment due process and equal protection rights were violated because the Franklin County grand jury was selected from a pool in which women, young adults and nonwhites were underrepresented and Kentucky State University students excluded, and for twenty years an insufficient number of women and young adults and no nonwhites were appointed to serve as a jury commissioner in Franklin County; (3) his sixth amendment right to a fair trial and effective assistance of counsel and fourteenth amendment equal protection right were violated by the district court's refusal to order funds for employment of an expert to complete the jury challenges, order an evidentiary hearing, and permit the filing of Dr. Edgell's affidavit; (4) the evidence introduced at trial was constitutionally insufficient to support a murder conviction; (5) he was denied his fourteenth amendment due process right when the state's serologist wasted or permitted the deterioration of the blood on his tee shirt, threw out Schick's blood sample and was permitted to give a surprise expert opinion that skin found at the scene of the crime was Ford's; and (6) his sixth and fourteenth amendment rights to confrontation and due process were violated by the trial court's ruling that his counsel could not see the state serologist's handwritten notes or have his expert serologist present during the state serologist's testimony to assist him.

## A.

### 1.

Ford first contends that the underrepresentation of women and "young adults" between the ages of 18 and 29 and exclusion of college students from the pool from which his jury was selected in Scott County denies his right, under the sixth amendment, to a petit jury selected from a fair cross-section of the community. *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).[1]

The *Duren* Court set forth the criteria necessary to establish a prima facie violation of the fair-cross-section requirement. The defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364, 99 S.Ct. at 668. Even if a prima facie fair-cross-section violation has been established by the defendant, the government may overcome the right to a proper jury by proffering a significant state interest that manifestly and primarily advance "those aspects of the jury selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68, 99 S.Ct. at 670.

With respect to the first part of the prima facie test, women undoubtedly are a distinctive group. *Id.* at 364, 99 S.Ct. at 668; *Taylor v. Louisiana,* 419 U.S. 522, 531, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975). Young adults and college students, however, do not comprise distinctive groups.

Although the Supreme Court has declined to define the term "distinctive group," *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986), several circuits have adopted the following three-prong test in determining whether young adults are a distinctive group under the sixth amendment: (1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex); (2) that a common

---

**1.** The sixth amendment's provision for jury trial was held applicable to the states by virtue of the fourteenth amendment in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Ford has standing to challenge exclusion resulting in a violation of the fair-cross-section requirement, whether or not he is a member of the excluded class. *Duren,* 439 U.S. at 359 n. 1, 99 S.Ct. at 666 n. 1.

thread or basic similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process. *See, e.g., Barber v. Ponte,* 772 F.2d 982 (1st Cir.1985) (en banc); *Willis v. Zant,* 720 F.2d 1212 (11th Cir.1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984).

In *Barber,* the court concluded that "young adults," described as persons between the ages of 18 and 34, did not meet any of the three requirements because there was no clear line of delineation between those who were "young adults" and those who are not, and even if such a boundary could be identified, there would still remain "clear differences in the attitudes, values, ideas and experiences" among the members of such a group. *Barber,* 772 F.2d at 998–99. *See also Anaya v. Hansen,* 781 F.2d 1, 5 (1st Cir.1986). The court also rejected categorizing "young adults" as a distinctive group because it is not one of the groups that the Supreme Court has traditionally sought to protect from underrepresentation.

> The *Duren* court used the concept of 'distinctive group' in a case where women were subjected to discrimination. It is fair to assume that the court wanted to give heightened scrutiny to groups needing special protection, not to all groups generally. There is nothing to indicate that it meant to take the further step of requiring jury venires to reflect mathematically precise cross sections of the communities from which they are selected. Yet if the age classification is adopted, surely blue-collar workers, yuppies, Rotarians, Eagle Scouts, and an endless variety of other classifications will be entitled to similar treatment. These are not the groups that the court has traditionally sought to protect from underrepresentation on jury venires.

*Barber,* 772 F.2d at 999 (citations omitted).

We agree with the First Circuit that it is impossible to clearly delineate the age boundaries of "young adults" and that such a group, therefore, cannot by definition be distinctive.

> The only way to establish the present group, particularly in view of the absence of any scientific or expert evidence in this record, is by arbitrary fiat superimposed on intuition. Even assuming we can be flatly arbitrary, we cannot seriously say that a grouping whose contours are rationally unsupportable is "distinctive." Is not a "distinctive" group, by definition, one whose membership is reasonably set apart from others by clear lines of demarcation.

*Id.* at 998. The arbitrary selection of ages in determining who constitutes a "young adult" is evident from the disparity in the ages used by the defendant in *Barber* and by Ford in this case. In *Barber,* persons between 18 and 34 years old were considered young adults, whereas Ford defines a young adult as anyone between the ages of 18 and 29.[2] We also agree that young adults are not a group traditionally protected by the Supreme Court and that if an age classification is adopted, the door would be opened to countless other "distinctive groups."

Finally, we note that each circuit that has considered the question has rejected the contention that young adults comprise a distinct group. *See Barber,* 772 F.2d at 1000; *Cox v. Montgomery,* 718 F.2d 1036, 1038 (11th Cir.1983); *Davis v. Greer,* 675 F.2d 141, 146 (7th Cir.), *cert. denied,* 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982); *United States v. Potter,* 552 F.2d 901, 905 (9th Cir.1977); *United States v. Test,* 550 F.2d 577, 591 (10th Cir.1976); *United States v. Olson,* 473 F.2d 686, 688 (8th Cir.), *cert. denied,* 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973); *United States v. DiTommaso,* 405 F.2d 385, 391 (4th Cir.1968), *cert. denied,* 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969).

For similar reasons, college students are not cognizable under *Duren.* There is no

---

**2.** Because it is impossible to adequately define a "young adult," we need not consider the remaining two criteria of the test for a distinctive group.

"common thread or basic similarity in attitude, ideas or experiences" sufficient enough to consider college students a distinctive group. Although the experience of attending college is shared, this slight similarity is of minimal import in light of the differing attitudes and ideas of those attending college. The present emphasis at most college campuses today in maintaining a balanced student body comprised of students of differing races, nationalities, and socio-economic backgrounds invalidates any hint of homogeneity. Additionally, we again are unconvinced that college students are the type of group the Supreme Court has traditionally attempted to protect. We note that the courts which have considered the question have concluded that education is inconsequential in determining whether a distinctive group exists under *Duren. See, e.g., Anaya,* 781 F.2d at 8.

■ Having determined that only women constitute a distinctive group under the first prong of *Duren,* we next consider whether the representation of women in the Scott County jury pool is fair and reasonable in relation to the number of women in the county. Kentucky utilizes the "keyman" system in selecting individuals to serve on both grand juries and petit juries. Each year, the chief circuit judge of each county appoints three jury commissioners for the county. The jury commissioners prepare a list of prospective jurors for the following year. Ky.Rev.Stat.Ann. § 29A.030 (Baldwin 1982). The list is compiled from a master list, which, in 1982, consisted of the county registration lists and property tax rolls. Ky.Rev.Stat.Ann. § 29A.050.[3] The statute does not indicate any criteria to be used in selecting the prospective jurors. The names of the prospective jurors are then placed in the jury wheel. Ky.Rev.Stat.Ann. § 29A.050. When a petit jury is needed, names are drawn from the wheel and listed in consecutive order. From these lists individuals are randomly selected to serve on the jury. The same process is used in selecting a grand jury. Census figures for 1970 indicate that women constituted nearly 53% of the population over eighteen years old in Scott County. According to Ford's analysis, however, women constituted only 31.3% of the 1980 pool and only 34.3% of the 1981 pool.[4]

■ The crucial question in determining whether the second prong of the *Duren* test is met is whether jury pools consisting of 31.3% and 34.3% women are fair and reasonable in relation to the actual percentage of women over eighteen in Scott County (53%). In *Duren,* the relevant community was comprised of 54% women. The Court found that jury venires containing approximately 15% women were not repre-

---

3. Ky.Rev.Stat.Ann. § 29A.040 (effective 10–1–82) now provides that the master list consists solely of the voter list.

4. In conducting the jury analysis, the lists of jurors drawn from the jury wheel in 1980 and 1981 were obtained. From each list, 100 persons were selected at random.

The government contends that Ford's analysis is flawed because it compares the percentage of women in the jury pools to the total number of women in Scott County over eighteen as opposed to those eligible for jury service. In 1982, Ky.Rev.Stat.Ann. § 29A.040 provided that jurors were to be selected from the "master list," which itself was comprised of the voter registration lists and the property tax roll for each county. In *Duren,* the Court explicitly rejected this argument: "[T]he fair-cross-section requirement involves a comparison of the makeup of jury venires or other sources from which jurors are drawn with the makeup of the *community,* not of voter registration lists." *Duren,* 439 U.S. at

365 n. 23, 99 S.Ct. at 669 n. 23 (emphasis in original).

The government also argues that the jury samples do not cover a significant enough period of time in accordance with *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). *Castaneda,* however, was an equal protection case involving the question of discriminatory intent. In *Duren,* counsel examined the sex of all jurors drawn weekly over an eight-month period from the same jury wheel. Counsel in this case, however, examined the sex of a random sample of two hundred of the total jurors drawn from two separate jury wheels spanning a two-year period. Thus, Ford's study covers a much longer period of time than the study in *Duren.* That the jurors were selected on a weekly basis in *Duren* is insignificant. The element of time at issue is the overall period during which the venires were chosen, not the periodic frequency of each spin of the jury wheel.

sentative of the community. *Duren*, 439 U.S. at 365–66, 99 S.Ct. at 669. The lack of women in the jury pools in this case, however, is not nearly as severe as in *Duren*. Because the percentage of women in the community differs slightly from the percentage of women in the community in *Duren*, it is necessary to compare the absolute disparity of the two cases.[5]

In *Duren*, the disparity between the percentage of women in the community and the percentage present in the jury venires was 39%. Here, on the other hand, the disparity is only 21.7% for 1980 and 18.7% for 1981, far below that found unreasonable in *Duren*. We need not decide whether a disparity of 18.7% or 21.7% is unreasonable, however, since we conclude that women were not systematically excluded during the selection process.

In *Duren*, a Missouri statute provided women an automatic exemption from jury service. The exemption was available at two different stages of the jury selection process. First, an exemption could be claimed on the questionnaire initially sent by the county. Only those questionnaires not claiming an exemption were placed in the jury wheel. Summonses were then sent on a weekly basis to prospective jurors randomly drawn from the jury wheel. Of the persons summoned, only 26.7% were female. *Duren*, 439 U.S. at 361–62, 99 S.Ct. at 667.

A woman was also deemed to have claimed an exemption if she failed to appear for jury service on the appointed day. The final result in *Duren* was that only 14.5% of the persons on the postsummons weekly venire during the period in which the petitioner's jury was chosen were female. *Id.*

Basing its decision on two factors, the Court concluded that the underrepresenta-

5. Ford urges the Court to apply "statistical decision theory" (SDT) in determining whether women are substantially underrepresented in the Scott County jury pool. First espoused in Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 Harv.L.Rev. 338 (1966), the Supreme Court utilized SDT in support of its decision in *Castaneda*, 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17. *Castaneda* involved a jury challenge under the equal protection clause.

Ford's expert utilized the chi-square test and resulting probability values to express his findings regarding the statistical significance of the disparity between the expected number of women in the 1980 and 1981 jury pools and the observed number. Although this Court has declined to decide at what point the assertion that a particular racial result should be rejected as due to chance rather than discriminatory, *Mitchell v. Rose*, 570 F.2d 129, 134 n. 4 (1978), *rev'd on other grounds*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), most courts have adopted the 0.05 level as significant.

A probability value below 0.05 is "generally considered to be statistically significant, i.e., when there is less than a 5% probability that the disparity was due to chance." *Coates v. Johnson & Johnson*, 756 F.2d 524, 537 (7th Cir.1985). *See also* D. Baldus and J. Cole, *Statistical Proof of Discrimination*, § 9.03 at 297 (1980). The analyses conducted by Ford's expert indicates that the probability that a sample would deviate from the population as much as the present sample did was one in one-thousand or 0.001.

We are not convinced, however, that SDT is necessary in the context of a fair-cross-section claim under the sixth amendment. SDT provides:

a measure of the extent to which a given distribution differs from the theoretical or expected random distribution and a test within mathematically determined limits of accuracy, whether the nature of the observed distribution is so at variance with the expected distribution that the hypothesis of random selection ought to be rejected.

Finkelstein, *supra*, at 352. Thus, SDT may be helpful in determining the likelihood of a particular result and thus the extent to which discrimination is responsible for that result. A sixth amendment fair-cross-section claim under *Duren*, however, does not involve the issue of discrimination as does an equal protection claim. *Duren*, 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26. This explains the discussion of SDT in *Castaneda* but not in *Duren*.

Finally, our rejection of the use of SDT in the context of a fair-cross-section claim is supported by the majority of courts which have considered the issue. *See, e.g., United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir.), *reh'g denied*, 448 U.S. 912, 101 S.Ct. 27, 65 L.Ed.2d 1173 (1980); *United States v. Jenkins*, 496 F.2d 57 (2d Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). *See also United States v. Rodriguez*, 776 F.2d 1509 (11th Cir.1985). *Cf. Alston v. Manson*, 791 F.2d 255, 259 (2d Cir. 1986) *cert. denied*, —— U.S. ——, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987); *United States v. La-Chance*, 788 F.2d 856, 867 (2d Cir.) *cert. denied*, —— U.S. ——, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986).

tion was systematic. First, the "undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized." *Id.* at 366, 99 S.Ct. at 669. Just as important, the Court also was able to establish when in the system the exclusion took place:

Petitioner Duren's statistics and other evidence also established when in the selection process the systematic exclusion took place. There was no indication the underrepresentation of women occurred at the first stage of the selection process—the questionnaire canvass of persons randomly selected from the relevant voter registration list. The first sign of a systematic discrepancy is at the next stage—the construction of the jury wheel from which persons are randomly summoned for service. Less than 30% of those summoned were female, demonstrating that a substantially larger number of women answering the questionnaire claimed either ineligibility or exemption from jury service. Moreover, at the summons stage women were not only given another opportunity to claim exemption, but also were presumed to have claimed exemption when they did not respond to the summons. Thus, the percentage of women at the final, venire stage (14.5%) was much lower than the percentage of women who were summoned for service (26.7%).

The resulting disproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the *system* by which juries were selected. Petitioner demonstrated that the underrepresentation of women in the final pool of prospective jurors was due to the operation of Missouri's exemption criteria.... Women were therefore systematically underrepresented within the meaning of *Duren*.

*Id.* at 366–67, 99 S.Ct. at 669 (emphasis in original).

Neither factor relied upon by the Court in *Duren* is present here. First, the alleged claim of underrepresentation in this case is supported only by the results of two samples. In *Duren*, the underrepresentation was evident in every weekly venire for a period of nearly a year. Continued underrepresentation made it evident that such underrepresentation was systematic, or "inherent in the particular jury-selection process utilized." *Id.* at 366, 99 S.Ct. at 669.[6]

Additionally, Ford points to nothing in the selection process which makes it obvious that the underrepresentation was due to the system itself. We do not believe that the selection of jurors from a neutral master list, without more, can be construed as "systematic exclusion" as defined in *Duren* merely because the percentage of women selected does not precisely mirror the percentage of women in the entire community. No evidence was presented by Ford indicating that the jury commissioners utilized a particular system or procedure in order to exclude women. Accordingly, because the underrepresentation of women was not a result of systematic exclusion, Ford's petit jury challenge fails.

**2.**

■ Ford also alleges that the underrepresentation of women and exclusion of

---

**6.** Although the frequency of the selection of jury venires is not, of itself, helpful in establishing underrepresentation under the second prong of the prima facie case, it is of crucial significance in establishing that any existing exclusion was systematic. In *Duren*, many of the exemptions claimed by women took place at the summons stage or when they simply failed to show up, both of which took place on a weekly basis. It was this continued confirmation of underrepresentation on a weekly basis which made it evident that the underrepresentation was a product of the availability of exemptions in the selection process.

Ford's suggestion that the selection process in *Duren* is indistinguishable from the process used in Scott County because the jury venires in both *Duren* and Scott County were drawn from the same jury wheel is invalid. That the venires were drawn from one wheel in both instances is itself of no significance since a large portion of the exemptions in *Duren* were claimed after the names were placed in the wheel.

young adults from the 33 Scott County jury commissioner positions selected during the 11–year period from 1971 to 1981 violates the due process and equal protection clauses of the fourteenth amendment. Of the 33 jury commissioners chosen to serve in Scott County from 1971 to 1981, 4 were women and none were under 30.

In *Carter v. Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), black citizens of Greene County, Alabama, sought, in part, an order vacating the appointments of the Greene County jury commissioners and compelling the governor, who selected the commissioners, to select new members without racial discrimination. *Id.* at 321, 90 S.Ct. at 519. Testimony before the district court indicated that the governor had appointed no blacks to the Greene County commission in the 12 years preceding the commencement of the suit. *Id.* at 338, 90 S.Ct. at 528.

In deciding the claim of discrimination, the Court "assume[d] that the state may no more exclude negroes from service on the jury commission because of their race than from the juries themselves." *Id.* The district court had found that plaintiffs "had shown only that for many years the jury commission had been composed entirely of white men, and concluded that without more [their] attack failed for want of proof." *Id.* In upholding the district court's ruling, the Supreme Court noted that it could not "say on this record that the absence of Negroes from the Greene County jury commission amounted to a prima facie showing of discriminatory exclusion." *Id.*

Applying the teaching in *Carter* to Ford's challenge to the Scott County commissioners under the due process clause, we assume that women may no more be excluded from service on the jury commis-

sion because of their sex than from the juries themselves. We further assume that the principles articulated by the Supreme Court in *Duren* regarding the right under the sixth and fourteenth amendments to a petit jury selected from a fair cross-section of the community are equally applicable to Ford's challenge to the Scott County jury commission. As we indicated, young adults are not a distinctive group under *Duren.* With respect to the underrepresentation of women, we again defer determining whether the lack of women appointed to the commission is a fair representation in comparison to the percentage of women in the community, since there is no evidence that women were systematically excluded during the appointment process. In *Duren,* the Court was able to pinpoint the exact stage in a complex selection process at which the exclusion of women took place. Here, on the other hand, the commissioners are simply appointed by the chief circuit judge at the beginning of each year. The chief circuit judge did not testify, and no evidence indicating that he had systematically excluded women from the jury commission was introduced. Ford has thus failed to make out a prima facie case under *Duren.* Additionally, although *Carter* involved a discrimination claim, the facts of this case are strikingly similar to those in *Carter.* As in *Carter,* we too are forced to conclude that the absence of women from the Scott County jury commission of itself does not amount to a prima facie case. *Carter,* 396 U.S. at 338, 90 S.Ct. at 528.

Turning to Ford's equal protection claim, because Ford is not a woman or a "young adult," and he does not challenge the underrepresentation or exclusion of blacks,[7] he is precluded from raising an equal protection claim.[8] In *Castaneda,* the

---

7. During the 11 year period between 1971 and 1981, 7 of the 33 jurors selected (21%) were black. According to the 1970 census report, of the total population in Scott County (17,948), only 1653, or 9% were black.

8. A claim of exclusion under the equal protection clause may be brought in the context of a petit jury, as well as, a grand jury challenge. Principles prohibiting exclusion of persons from

participation in jury service on account of their race are essentially the same for grand juries and petit juries. *Batson v. Kentucky,* 476 U.S. at 84 n. 3, 106 S.Ct. at 1716 n. 3. Under *Carter,* the equal protection clause also protects against the exclusion of persons from jury commissions. We find no reason why the limitation precluding a petitioner from challenging the exclusion of persons from a particular class of which he is

Supreme Court held that in order to make out a prima facie case of discrimination under the equal protection clause, "the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280. *Accord Alexander v. Louisiana*, 405 U.S. 625, 633, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972) (male petitioner could not challenge alleged exclusion of females from grand jury.)[9] In *Aldridge v. Marshall*, 765 F.2d 63 (6th Cir.1985, *cert. denied*, 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986), the Court relied on the language in *Castaneda* in rejecting the petitioner's grand jury challenge because he was not a member of the alleged excluded classes: doctors, lawyers, students, the clergy, dentists, the sick, or felons. *Id.* at 69. *Accord United States v. Cronn*, 717 F.2d 164 (5th Cir.1983); *United States v. Coletta*, 682 F.2d 820 (9th Cir. 1982).

### B.

#### 1.

Ford also challenges the composition of the jury pool in Franklin County from which the grand jurors who indicted him were selected and the composition of the jury commissions which selected the potential jurors. First, he alleges that his due process and equal protection rights were violated because the grand jury was selected from a pool in which women, young adults and nonwhites were underrepresented, and Kentucky State University (KSU) students were excluded.

▮ With respect to the due process claim, both parties vehemently dispute whether Ford has standing to challenge the composition of the grand jury under the due process clause. The Kentucky Supreme Court held that "grounds for challenge of the composition of the grand jury panel lie in the equal protection clause of the Fourteenth Amendment and not in the due process requisites of the Fifth and Sixth Amendments." *Ford v. Commonwealth*, 665 S.W.2d at 306. The Magistrate recommended that Ford has standing to make a due process challenge pursuant to *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), but the district court decided, "in practical terms it makes no difference," and rejected the claim on the merits. The unsettled nature of the question is further underscored by Justice Marshall's strong dissent in the Supreme Court's denial of Ford's petition for certiorari. *Ford v. Commonwealth*, 469 U.S. 984, 105 S.Ct. 392, 83 L.Ed.2d 325 (1984). Justice Marshall contended that "the conflicting pronouncements from the Court and our failure to speak definitively to the issue has spawned the sort of confusion in the lower courts that calls for the exercise of this Court's certiorari jurisdiction." *Ford*, 469 U.S. at 986, 105 S.Ct. at 393.

Although the Supreme Court has not decided the issue, and although two federal courts of appeal have held that a male defendant may raise a due process claim, *see, e.g., Gibson v. Zant*, 705 F.2d 1543 (11th Cir.1983); *Folston v. Allsbrook*, 691 F.2d 184, 186 n. 3 (4th Cir.1982), *cert. denied*, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed. 2d 314 (1983), this Court concluded in *Aldridge* that a due process claim cannot be raised in a challenge to the composition of the grand jury which indicted the petitioner.

Petitioner's final argument is that his Fifth, Sixth and Fourteenth Amendment rights were violated when doctors, lawyers, clergy, the elderly, the sick, dentists, college students and felons were excluded by one of the jury commissioners from the *grand jury*. At the outset we note that cases challenging the makeup of state grand juries are analyzed

---

not a member in the context of a petit jury or grand jury challenge should not also apply to a challenge to the selection of jury commissioners.

9. The requirement that the defendant be a member of the excluded class in order to have standing to allege an equal protection claim was reaffirmed by the Supreme Court in *Rose v. Mitchell*, 443 U.S. 545 (1979), and more recently in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

under the equal protection clause of the Fourteenth Amendment, *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *see also Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), while the right to a representative state petit jury is protected under the Sixth Amendment fair cross-section requirement. *See Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The basis for this distinction results from the now well-settled constitutional holding that the Fifth Amendment right to a grand jury does not apply to state prosecutions. *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), although the Sixth Amendment right to a petit jury made up of a fair cross-section of the community, of course, does apply to state prosecutions. *See Taylor,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

*Id.* at 68 (emphasis in original). Based on the holding in *Aldridge,* we conclude that Ford does not have standing to challenge the composition of the grand jury pool under the due process clause.[10]

■ With respect to the equal protection claim, Ford again is precluded from challenging the exclusion of women, young adults, and college students.[11] He may, however, challenge the underrepresentation of nonwhites. The elements of an equal protection challenge were summarized in *Castaneda:*

> In order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresenta-

tion of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.

> Next, the degree of underrepresentation must be proved by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.... Finally, ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Castaneda,* 430 U.S. at 494–95, 97 S.Ct. at 1280.

Even assuming that "nonwhites" are a recognizable, distinct class, the degree of underrepresentation, by the admission of Ford's own expert, is insignificant. In conducting the jury analysis, Ford's counsel randomly selected 98 names from the 1979 jury pool and 100 names from the 1980 jury pool. Ford's expert testified that nonwhites represented only 5.1% of the names drawn from the 1979 pool and 5% of those drawn from the 1980 sample. He further testified that the census report indicated that nonwhites represented 9% of the persons living in the county. In his affidavit, Ford's expert concluded that, "None of the analyses for race reached significance." (Aff. of Stephen E. Edgell, Ph.D., at 3). In reaching his conclusion, Dr. Edgell noted that the probability value did not reach the 0.05 level, the level which most statisticians including Dr. Edgell, deem statistically significant.[12] Mere speculation that a larger

---

**10.** Even if Ford did have standing to raise a due process claim, however, he would be unable to establish a prima facie case under *Duren* and the claim would fail on the merits. First, college students and young adults are not distinctive groups under the first prong of *Duren.* With respect to women and nonwhites, their underrepresentation was not inherent in the system and thus they were not systematically excluded. *Duren,* 439 U.S. at 366–67, 99 S.Ct. at 669–70.

**11.** Although a large percentage of the students at KSU are black, the percentage of blacks resid-

ing in Franklin County is considered in a separate analysis. Ford was not a college student.

**12.** As explained in footnote 5, a probability value of 0.05 means there is a 5% probability, or 1 chance in 20 that the disparity was due to chance. In *Castaneda,* the Court stated that "if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Castaneda,* 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17. The two or three standard deviation benchmark applied in *Castaneda* is essentially equivalent to proba-

sample might have increased the probability level is insufficient to alter the results of Dr. Edgell's analysis.

### 2.

■ Ford also alleges that the underrepresentation of women and exclusion of blacks from the Franklin County jury commission during the period of time from 1960–1980, violates the due process and equal protection clauses. We again conclude that under *Aldridge*, Ford is without standing to raise the due process claim. Although *Aldridge* involved a challenge to the grand jury pool itself and not the commissioners, where the underlying claim challenges the grand jury pool itself, the holding in *Aldridge* is equally applicable to a challenge to the composition of the jury commission.

■ With respect to the equal protection claim, Ford lacks standing to challenge the underrepresentation of women since he is not a member of that class. *Aldridge*, 765 F.2d at 69. The only question remaining is whether the exclusion of blacks from the jury commission during the period of time between 1960 and 1980 violates the equal protection clause.[13] Although we are somewhat alarmed at the absence of appointment of blacks over the twenty-year period, we do not believe that the equal protection clause has been violated under *Carter*. In *Carter*, the Court concluded that the mere fact that no blacks had been appointed to the commission for twelve years was insufficient to establish a prima facie case of discrimination. Ford, as in *Carter*, has failed to proffer any evidence of discrimination. Although the

absence of blacks has lasted eight years longer than in *Carter*, we do not believe this fact alone is sufficient to distinguish *Carter*. See *Hale v. Henderson*, 485 F.2d 266 (6th Cir.1973), *cert. denied*, 415 U.S. 930, 94 S.Ct. 1442, 39 L.Ed.2d 489 (1974) (relying on *Carter* to support finding that in history of county, of 150 foreman and foremen pro tempore, none was black despite black county population of 25 to 37 percent)[14].

■ Even if the absence of blacks on the jury commissions is, without more, sufficient to prove a violation of equal protection, the Constitution does not compel reversal of Ford's conviction since Ford suffered no prejudice and any discrimination in the appointment of the commissioners would not undermine the integrity of the indictment and conviction. After thoroughly considering each of his constitutional attacks on the composition of the jury pools in both Franklin and Scott County, we have concluded that there was no constitutional violation under either the sixth or fourteenth amendments. Regardless of whether the lack of blacks on the jury commissions was a result of purposeful discrimination, Ford received all the constitutional protection he was entitled to when indicted and throughout his trial.

Additionally, the impact of any perceived discrimination in selecting the commissioners would not, because of the technical nature of the commissioners' job responsibilities, cast doubt on the judicial process. In *Hobby v. United States*, 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984), the Supreme Court held that although the dis-

---

bility values of 0.05 and 0.01 respectively. D. Baldus and J. Cole, *Statistical Proof of Discrimination*, § 9.03 at 297 (1980).

**13.** Although no blacks were appointed as commissioners in Franklin County between 1960 and 1980, as indicated in footnote 7, 21% of the commissioners selected in Scott County between 1971 and 1981 were black. The total black population in Scott County is only 9%.

**14.** Although *Carter* involved a civil suit brought by a group of black citizens alleging that they had been systematically excluded from serving on juries and jury commissions, the principles in *Carter* have been consistently applied in the

context of a criminal trial by both the Supreme Court, *see, e.g., Castaneda*, 430 U.S. at 492, 493, 97 S.Ct. at 1279; *Johnson v. Louisiana*, 406 U.S. 356, 397, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972) (Stewart, J., dissenting), and this Court in *Hale*. Indeed in *Hale*, the majority refused to distinguish *Carter* on this basis. Additionally, the *Carter* Court itself implicitly relied upon previous decisions involving jury challenges by criminal defendants when it stated that "we ... assume that the State may no more exclude Negroes from service on the jury commission because of their race than from the juries themselves." *Carter*, 396 U.S. at 338, 90 S.Ct. at 528.

criminatory selection of federal grand jury foremen violates the constitution, reversal of a criminal defendant's conviction is an inappropriate remedy for the violation because grand jury foremen play a minor part in federal prosecutions. *Hobby,* 468 U.S. at 350, 104 S.Ct. at 3099. The Court held that "the role of the foreman of a federal grand jury is not so significant to the administration of justice that discrimination in the appointment of that office impugns the fundamental fairness of the process itself so as to undermine the integrity of the indictment." *Id.* at 345, 104 S.Ct. at 3097. The Court determined that the role of the foreman is insignificant because the responsibilities of a foreman are not a creature of the Constitution and are clerical in nature, and also because a foreman has no influence in determining whether an individual is to be prosecuted. Here, the jury commissioners in Kentucky are not a creature of the Constitution but of Kentucky statutory law and their responsibility of selecting jurors is merely clerical in nature. Additionally, the jury commissioners do not participate as grand or petit jurors and thus have no direct influence over the outcome of any criminal cases. Ford's equal protection claim must therefore be rejected.

## II.

### A.

Ford's four remaining arguments in support of his petition must also be rejected. Ford first contends that the trial court's failure to order funds for the employment of experts to conduct further statistical research for the jury challenges violates several constitutional provisions, and the district court improperly denied him an evidentiary hearing and refused to let him file Dr. Edgell's additional affidavit. The due process clause of the fourteenth amendment requires that a state take certain steps to ensure that an indigent criminal defendant has a fair opportunity to prepare his defense.

This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Ake,* the Supreme Court considered what conditions must be present in order to require a state to provide a defendant with access to competent physciatric assistance in order to prepare his defense. The Court found three factors relevant to the determination:

> The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Id.* at 77, 105 S.Ct. at 1093. We find this three-prong test applicable to this case and conclude that the state's refusal to provide funding for expert assistance did not violate the due process clause.

Admittedly, Ford's interest in the accuracy of the proceeding is great since it is determinative of his liberty. The government's interest, however, is also great. Requiring the State of Kentucky to fund a jury challenge of each defendant convicted of a crime would create an enormous financial burden upon the state. More importantly, however, the risk of an erroneous deprivation of Ford's liberty, is, under the present facts, slight. Ford requested additional funds to complete the jury challenges. Based upon the reasoning underlying our rejection of the challenge to the petit and grand juries, the only information sought by Ford's counsel which arguably might be beneficial is the larger sample size for 1979–1980. Dr. Edgell testified in his affidavit and at trial that although none of the analyses for race reached significance, with a larger sample size the result might be different. Ford, an indigent, was well-represented at trial and on appeal by

public defenders. A thorough jury analysis was conducted. The contention that a larger sample size may have altered the level of significance is merely speculative. Accordingly, we find that the lower court's refusal to provide additional funds for further expert assistance did not deny Ford the opportunity to participate meaningfully in the proceedings below.

■ Ford also contends that the district court should have granted his request for an evidentiary hearing on the issue of whether young adults and college students are cognizable groups. Whether an evidentiary hearing is mandatory depends upon whether one of the eight circumstances listed in 28 U.S.C. § 2254 is present.[15] *McMillan v. Barksdale*, 823 F.2d 981 (6th Cir.1987). *See Loveday v. Davis*, 697 F.2d 135 (6th Cir.1987). Because none of these circumstances were shown by the petitioner, admitted by the state or "otherwise appear" from the record, *McMillan*, 823 F.2d at 984; *Loveday*, 697 F.2d at 138, the district court did not err in deciding the merits of Ford's claim without first holding an evidentiary hearing.

■ Finally, Ford's contention that the district court should have permitted the filing of Dr. Edgell's second affidavit under Rule 7(b) is simply without merit. Rule 7(b) authorizes a district court to request additional material when a habeas petition is not summarily dismissed. Expansion of the record is not mandatory, however, and is left to the discretion of the trial judge. The trial judge did not abuse his discretion in refusing to accept the submission of Dr. Edgell's second affidavit since the affidavit only attempts to rectify his earlier testimony.

### B.

■ Ford next contends that the evidence introduced at trial was constitutionally insufficient to support a murder conviction. The constitutional standard for reviewing the sufficiency of the evidence in habeas cases was set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, *reh'g denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979): "[T]he relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." "[C]ircumstantial evidence alone can sustain a guilty verdict and ... to do so, circumstantial evidence need *not* remove every reasonable hypothesis except that of guilt." *United States v. Townsend*, 796 F.2d 158, 161 (6th Cir.1986), (quoting *United States v. Stone*, 748 F.2d 361, 362 (6th Cir.1984) (emphasis in original)).

Ford was one of 12 prison "trustys" who resided at the Governor's Mansion in Frankfort when 25 year old Suzanne Schick was stabbed to death outside her apartment directly across the street from Governor Brown's mansion. Two of Suzanne's neighbors were awakened shortly after 1:00 a.m. on September 11, 1980 by a woman's screams. Suzanne's nude corpse, covered with blood, was found inside the hall leading upstairs to her apartment.

At 5:00 a.m. police inspected the trusty's quarters and noticed that Ford's left hand was bleeding and swollen. No such injuries had been observed on Ford at a 12:45 a.m. bedcheck.

One of Ford's friends, a prison trusty living there, had seen him standing outside her apartment shortly before 1:15 a.m. Another prison trusty heard Ford's door open, heard water running in the shower, and then heard the door close some time after 1:15 a.m., but before the 5:00 a.m. inspection.

A search of his living quarters yielded several bloody items, including Ford's tee

---

**15.** These circumstances were recently summarized in *McMillan v. Barksdale*, 823 F.2d 981 (6th Cir.1987).

Section 2254(d) provides that state court factual findings "shall be presumed to be correct, unless ..." the facts were not "resolved" or "adequately developed," or the state court's fact finding procedures were not "fair" or lacked "due process," or unless the state record does not support the facts as found. 28 U.S.C. § 2254(d).

*Id.* at 983–84 n. 3.

shirt. Tissue and trash with the possible presence of blood were found in Ford's bathroom.

A hole in the wall at the murder scene was of a size and shape consistent with a left-handed punch. Skin tissue removed from the hole matched that missing from Ford's left hand. Reviewing this evidence in the light most favorable to the prosecution we cannot conclude that no rational trier of fact could have found Ford guilty of capital murder.

### C.

 Ford next contends that he was denied due process when the State's serologist, David Alford, disposed of Schick's blood sample and wasted and let deteriorate the blood sample on his tee shirt, and when Alford was permitted to give a surprise expert opinion that skin found at the crime scene was Ford's. In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court stated:

> [T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution.

*Id.* at 87, 83 S.Ct. at 1196–97. In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Court considered whether the fourteenth amendment also demands that the State preserve potentially exculpatory evidence on behalf of defendants. At issue in *Trombetta* was whether law enforcement agencies must preserve breath samples in order to introduce breath analysis tests at trial. The Court set forth the following test:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.
> To meet this standard of constitutional materiality, ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain

comparable evidence by other reasonably available means.

*Id.* at 488–89, 104 S.Ct. at 2534 (footnote and citations omitted).

In applying this two-part test, the Court concluded that California's policy of not preserving breath samples was not constitutionally defective. The Court's analysis was summarized in *Elmore v. Foltz*, 768 F.2d 773 (6th Cir.1985):

> The Court reasoned that the Intoxilyzer's general reliability was reason enough to conclude that preserved breath samples would probably not have been exculpatory. As to the nature of the evidence, the Court determined that defendants could reasonably have obtained comparable evidence: data on possible sources of mechanical error could have been used to impeach the Intoxilyzer's reliability and, with respect to possible human error, the defendants retained 'the right to cross-examine the law enforcement officer who administered the Intoxilyzer test, and to attempt to raise doubts in the mind of the fact-finder whether the test was properly administered.'

*Id.* at 777 (citation omitted).

In *Elmore*, the petitioner was convicted of delivering a controlled substance. The conviction arose out of a transaction between the petitioner and an individual working for the police as a confidential informant. Although this transaction was not monitored, several other subsequent transactions were monitored and taped. The Court found *Trombetta* indistinguishable and concluded that the destruction of tapes and conversations between the petitioner and an informant did not constitute a due process violation. After noting that the magistrate found that there was no bad faith in the destruction of the tapes, the Court held that the chances that the tapes would have proved exculpatory were negligible and that the informant's reliability could be challenged by means other than the destroyed tapes.

Applying *Trombetta* and *Elmore* to this case, the destruction of Schick's blood sample and the alleged waste and deterioration of the blood on Ford's tee shirt does not

violate due process. First, the magistrate concluded that the state serologist was acting in good faith when he failed to preserve the samples. Additionally, the magistrate properly concluded that although the preservation of the samples might have contributed to Ford's defense, the possibility that the preserved samples could have led to Ford's exculpation would have been extremely slim. Even if the blood samples had exculpatory value, Ford was not unable to obtain comparable evidence by other reasonable means. Although it is true Ford could not conduct blood tests after the samples were disposed of or had expired, under *Trombetta*, "all that matters is that some reasonable alternative means exists for attempting to do what one would have attempted to do with the destroyed evidence." *Elmore*, 768 F.2d at 778. Ford could have cast aspersions of doubt upon the use of Ford's tee shirt as evidence of Ford's guilt in a number of ways. The destruction of samples did not violate due process.

Ford attacks the constitutionality of Alford's testimony at trial that a piece of skin found at the crime scene originated from Ford's hand on two grounds. First, Ford contends that Alford's testimony deprived Ford of fundamental fairness and due process in contravention of the sixth and fourteenth amendments since Alford was not an "expert" in this field.[16]

In *Kentucky Power Co. v. Kilbourn*, 307 S.W.2d 9 (1957), the Kentucky Supreme Court held that, "The decision as to qualifications of the witness as an expert rests in the sound discretion of the trial court." *Id.* at 12. The Court further concluded that "While it is clear that a witness in order to be competent as an expert must show himself to be skilled in the business or profession to which the subject about which he is called to testify relates, there is no precise rule as to the mode in which such skill or experience must be acquired."

A witness may become qualified by practice or an acquaintance with the subject. He may possess the requisite skill by reason of actual experience or long observation. *Id.*

Alford is a forensic serologist who identifies and tests biological materials working with microscopic comparisons for size, quantity and quality. We do not believe that the trial court's decision to allow Alford to testify as an expert was fundamentally unfair. In any event, any damage was rendered harmless by the testimony of Dr. Kasdan, Ford's expert, that Alford's method of identifying the skin found at the crime scene as Ford's was scientifically unacceptable.

Ford also contends that Alford deliberately evaded revelation of the skin match-up test during his deposition and that Alford's surprise testimony at trial violated due process. The Kentucky Supreme Court and magistrate correctly concluded that Alford did not evade questions concerning the skin match-up during his deposition and that Ford should not have been surprised by Alford's testimony. Additionally, any error was harmless in light of Dr. Kasdan's rebuttal testimony.

**D.**

In his final argument, Ford first contends that Alford's failure to include in his report any information about the process he used in reaching his conclusions and the government's refusal to give Ford a copy of Alford's handwritten notes, denied Ford his right to confrontation and due process under the sixth and fourteenth amendments. Although the parties argue whether the court's action was appropriate under state law, the proper question is whether the prosecution's failure to provide the requested information rises to the level of a constitutional violation. Under the standard set forth in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), for determining whether a conviction should be reversed because

---

**16.** We recognize "the well established rule that habeas review does not ordinarily extend to state court rulings on the admissibility of evidence." Where, however, "erroneous application of state law deprives a petitioner of fundamental constitutional guarantees, a federal court will inquire into the state ruling on habeas review." *Fuson v. Jago,* 773 F.2d 55, 59 (6th Cir.1985) (citations omitted).

the prosecutor failed to disclose requested evidence that could have been used to impeach government witnesses, Ford's argument fails.[17] It is not reasonably probable that had the handwritten notes been disclosed to Ford, the result of the proceeding would have been different.

The trial court's decision not to except Ford's expert from exclusion under the appropriate state rule was a matter to be left to the court's discretion and is normally not appealable, *Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 630 (6th Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978), and Ford did not show that it was necessary for the management of his case. In any event, it does not rise to the level of a constitutional violation.

For these reasons Ford's petition for a writ of habeas corpus must be denied.

---

**17.** In *Bagley*, the Court concluded that the suppression of evidence which might be helpful to the defense in the cross-examination of one of the government's witnesses amounts to a constitutional deprivation only if it deprives the defendant of a fair trial. The Court further held that a "constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381.

The Court prescribed the following test for determining the materiality of evidence specifically requested by the defense and which the prosecution has failed to destroy:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3384. *Accord Pennsylvania v. Ritchie*, 480 U.S. ——, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).