260 N.J. Super. 449 (1992)
616 A.2d 1323
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
NICHOLAS WILLIAM BELLAMY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 27, 1992.
Decided November 25, 1992.
*450 Before Judges ANTELL, DREIER and SKILLMAN.
Zulima V. Farber, Public Defender, attorney for appellant (Steven M. Gilson, designated counsel, of counsel and on the brief).
Andrew K. Ruotolo, Jr., Union County Prosecutor, attorney for respondent (Steven J. Kaflowitz, Assistant Prosecutor, of counsel).
The opinion of the court was delivered by ANTELL, P.J.A.D.
*451 On November 23, 1988, defendant was a passenger in the front seat of an automobile driven by codefendant John Watson (hereinafter "the driver"). That evening, the vehicle was stopped by State Troopers Michie and Miller for speeding on the New Jersey Turnpike in Elizabeth at 11:53 p.m. As the troopers approached the car, Michie, who was on the passenger's side of the vehicle, noticed the driver moving his right hand toward his inside jacket pocket. When Michie alerted Miller, who was on the driver's side of the car, of what he had just seen, Miller took the driver out of the car and led him to the rear of the car to perform a protective patdown. As he touched the left breast pocket area of the driver's open jacket Miller felt a large, hard object. The driver then reached into the jacket, presumably to seize the object, but at Miller's order withdrew his hand. Trooper Miller thereupon took a .22 calibre handgun from the inside pocket of the driver's jacket.
After Miller secured the driver's gun, Michie asked defendant to step out of the car. The troopers' ensuing search of the vehicle revealed a bag filled with cocaine in the arm rest compartment located on the driver's side door. Defendant later informed Trooper Miller that his credentials were in his jacket on the back seat of the car. When the officer picked up the jacket he found another .22 calibre handgun in the garment's pocket.
Defendant now appeals from his conviction for possession of a controlled dangerous substance with intent to distribute, contrary to N.J.S.A. 2C:35-5(a)(1), and 2C:35-5(b)(1), on which he was sentenced to a ten-year custodial term with a parole ineligibility period of three and one-third years. Defendant was also assessed a DEDR penalty of $3000, a laboratory fee of $50, and a VCCB penalty of $30. Additionally, his driver's license *452 was suspended for two years.[1]
Defendant's first contention on this appeal is that he was denied his right to a trial by an impartial jury because the prosecution exercised peremptory challenges on constitutionally-impermissible grounds in violation of State v. Gilmore, 103 N.J. 508, 511 A.2d 1150 (1986).
Sixteen blacks were included among the sixty-eight members of defendant's jury panel. During the selection process, the prosecutor peremptorily excused four black women, Felicia Simon, Elmethia Lewis, Rosa Mitchell, and Lois Mason McLeod. When defense counsel objected, the court called upon the prosecutor to articulate his explanation for exercising the peremptory challenges. In so doing, the court followed the mandate of State v. Gilmore, supra, 103 N.J. at 537-38, 511 A.2d 1150. The prosecutor then gave the following explanations:
Felicia Simon
I knocked her off because she was young, and I ask your Honor to take note that just about every young person on that jury was knocked off by me. She has a brother who is twenty-three years old and has no job. That puts him in the same general age as the defendants. And I have every reason to believe that may become somewhat of an issue.
Rosa Mitchell
She was number one. At that point, Judge, I counted nine women on the jury and the significant reason why I knocked her off is because she did not appear to me to be a strong personality, which I consider necessary in my trying the case that she was going to occupy the foreperson's spot. She did not come across as a leader.
Lois Mason McLeod
A young woman, I believe. That's why I did. I have it written down here, "young."
As to the fourth black woman, Elmethia Lewis, both the defense attorney and the prosecutor agreed that "it was obvious that she had trouble indicating whether she was going to be fair and impartial." The court thereupon found that the prosecutor had satisfactorily explained the questioned challenges, *453 and denied defendant's motion to begin the proceedings anew with a fresh jury panel. In so ruling, the court made the following observations:
It's been shown in terms of attitude that people, young individuals, tolerate drugs, have different feelings about it.
I also note for the record the defense has been knocking out a lot of senior citizens peremptorily in terms of their challenges for the same reasons.
So that's something that goes on in this court all the time. So I don't hold it against ... [the prosecutor] simply because these people happen to be young, happen to be young and black.
The record supports the trial court's determination that the prosecutor did not peremptorily excuse the four black women because of their color. The jury that heard the case contained seven black members, five of whom participated in deliberations.
Defendant argues that "young" people form a cognizable group within the meaning of State v. Gilmore, and that by allowing the prosecutor to challenge them peremptorily the court denied defendant the right to a trial by a fair and impartial jury representing a cross-section of the community. In State v. Ramseur, 197 N.J. Super. 565, 485 A.2d 708 (Law Div. 1984), dealing with a claim by defendant that he had been denied his right to a fair and impartial jury and equal protection of the laws by the county's jury selection procedures, the court noted that "[n]o evidence was offered and this court does not find young people to be a distinctive group for the purpose of this Sixth Amendment challenge to the jury selection system." Id. at 578-79, 485 A.2d 708. In affirming in material part, the Supreme Court wrote that "[t]o prove either an equal protection or fair cross-section claim, a defendant must first identify a constitutionally cognizable group, i.e., a group capable of being singled out for discriminatory treatment." State v. Ramseur, 106 N.J. 123, 215, 524 A.2d 188 (1987). But more recently, in State v. Zavala, 259 N.J. Super. 235, 611 A.2d 1169 (Law Div. 1992), the Law Division wrote: "Although young persons do not constitute a cognizable group, the prosecution's admitted exclusion of all young persons from the jury constitutes an *454 exclusionary tactic based on group bias" 259 N.J. Super. at 242, 611 A.2d at 1173.[2]
The question of whether age-defined groups may be considered cognizable for our purposes was carefully considered in State v. Pelican, 154 Vt. 496, 580 A.2d 942 (1990). There, the Supreme Court of Vermont noted that with few exceptions both state and federal courts have held that age by itself is an insufficient standard by which to establish a distinctive group. It noted that there are three main grounds on which courts reach that result:
(1) The parameters of the group are difficult to ascertain and, as a result, varying age limits are used in the claims;
(2) The defendant has not proved that the values and attitudes of the group are substantially different from other segments of the community or that the values and attitudes of members of the group are cohesive and consistent; and
(3) The membership of the group is in flux.

[Id., 580 A.2d at 947.]
With respect to the first ground, the Court noted that the Kentucky Supreme Court has found that young people are not cognizable because "the terminal ages of `young adults' defy definition, and we know of no end to the maze that could be created by classifying jurors as young adults, middle aged adults, elderly adults, and on and on." Id. at 947-48 (quoting Ford v. Commonwealth, 665 S.W.2d 304, 308 (Ky. 1983)). It noted also that in Ford v. Seabold, 841 F.2d 677, 682 (6th Cir.), cert. denied, 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988), the Sixth Circuit Court of Appeals commented that age limits considered in various cases for group definitions have been essentially arbitrary.
As to the second ground, the Vermont Supreme Court noted that other courts based their findings in part on the fact that young adults are not a group that has traditionally needed *455 special legal protection. Ibid. (quoting Ford v. Seabold, supra, 841 F.2d at 682). Pelican noted Ford's admonition that "if an age classification is adopted, the door would be opened to countless other `distinctive groups.'" Ibid. In denying the defendant's claim for relief, the Pelican court wrote as follows:
We conclude that the majority holdings are well reasoned. We are particularly concerned that group definitions like those involved here are arbitrary such that some attitudes of members within the group may be greatly dissimilar, while, at the same time, many group members share attitudes with those outside the group. Nevertheless, we agree with the Georgia Supreme Court that we cannot say that an age-defined group can never be found to be distinctive. See Parks v. State, 254 Ga. [403] at 411, 330 S.E.2d [686] at 694. The record must, however, respond to the first two grounds for denying that age-defined groups are distinctive. [Ibid.]
In its discussion in Gilmore on "discrete, cognizable groups," our Supreme Court went no further than to identify those defined "on the basis of religious principles, race, color, national origin, and sex." 103 N.J. at 526-27, n. 3, 511 A.2d 1150. See, e.g., N.J. Const. art. I, ¶ 5. It noted that the foregoing classifications are "suspect or semi-suspect classifications triggering strict or intermediate scrutiny under federal equal protection analysis." Id. The opinion's supporting reference to Cleburne v. Cleburne Living Centers, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), leaves no doubt that Gilmore was not written to encourage an endless proliferation of "cognizable groups."
In Cleburne, after determining that classifications by "race, alienage, or national origin" call for heightened scrutiny, the Supreme Court of the United States elaborated its rationale in the following language:
These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy  a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. McLaughlin v. Florida, 379 U.S. 184, 192, 13 L.Ed.2d 222, 85 S.Ct. 283 [288] (1964); Graham v. Richardson, 403 U.S. 365, 29 L.Ed.2d 534, 91 S.Ct. 1848 (1971). Similar oversight by the courts is due when state laws impinge on personal rights protected by the Constitution. *456 Kramer v. Union Free School District No. 15, 395 U.S. 621, 23 L.Ed.2d 583, 89 S.Ct. 1886 (1969); Shapiro v. Thompson, 394 U.S. 618, 22 L.Ed.2d 600, 89 S.Ct. 1322 (1969); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 86 L.Ed. 1655, 62 S.Ct. 1110 (1942).

[Id. at 440, 105 S.Ct. at 3254, 87 L.Ed.2d at 320.]
In holding that sex-based classifications also require a heightened degree of scrutiny, the Court declared that gender "generally provides no sensible ground for different treatment ... Rather than resting on meaningful considerations, statutes distributing benefits and burdens between the sexes in different ways very likely reflect out-moded notions of the relative capabilities of men and women." Id. at 440-41, 105 S.Ct. at 3254-55, 87 L.Ed.2d at 320-21. After drawing similar conclusions regarding "official discriminations" relating to persons of illegitimate birth, the Court wrote:
We have declined, however, to extend heightened review to differential treatment based on age:
"While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a `history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562 [2566], 49 L.Ed.2d 520 (1976). [Emphasis added.]
[Id. 473 U.S. at 441, 105 S.Ct. at 3254, 87 L.Ed.2d at 321.]
The New Jersey Supreme Court in Gilmore noted the division already existing in federal and state courts "as to whether groups defined by age, economic status, and occupation, for example, might in particular cases in certain communities be cognizable groups." 103 N.J. at 527, n. 3, 511 A.2d 1150. It refrained, however, from resolving these and other issues, concluding that "whatever the criteria for deciding such questions, Blacks clearly constitute a cognizable group." Id. Reading this determination together with the pronouncements of Cleburne we conclude that to be classified as cognizable under Gilmore, a group must be one that has been historically excluded, on the basis of stereotypical prejudices, from full *457 participation in the significant duties and privileges of American citizenship. So judged, we hold that, until demonstrated otherwise, age-defined groups are not cognizable for purposes of impartial jury analysis.
Defendant next contends that the pat down of the driver resulting in the discovery of his handgun was violative of the Fourth Amendment to the United States Constitution and Article I, para. 7 of the New Jersey Constitution. Trooper Michie testified that when he saw the driver's hand move toward his inside jacket pocket he "feared that [the driver] might have a weapon or something hidden in there." He based this anxiety on past incidents involving handguns concealed within a holster in that area of the driver's body. Under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where a police officer has reason to conclude in light of his experience that the person with whom he was dealing may be armed and dangerous, he is free to conduct "a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id. at 30-31, 88 S.Ct. at 1884-85, 20 L.Ed.2d at 911. While it was equally inferable that the driver herein was merely reaching for his driving credentials, we strike the balance under these circumstances in favor of the officer's safety. The driver should not have been spared this minimally intrusive search at the cost of creating a significant risk of harm to the policeman. As the Supreme Court noted in State v. Lund, 119 N.J. 35, 37, 573 A.2d 1376 (1990), a study presented by the attorney general showed that forty percent of State Troopers killed nationwide in the line of duty from September 1976 to September 1982 met their death while making traffic stops.
Finally, defendant contends that the court erred in denying his motion for a directed judgment of acquittal. We conclude that the evidence supported a finding of knowing and intentional possession of the 8.71 ounces of cocaine found in the compartment below the driver's side arm rest. Expert testimony *458 established that that amount of cocaine could be sold for approximately $45,000. Furthermore, the compartment was only an arm's length away from defendant in a location to which defendant had access. Compare, State v. Palacio, 111 N.J. 543, 545 A.2d 764 (1988). Finally, the presence of a handgun in his jacket pocket is consistent with defendant's role as a drug trafficker. On these facts defendant's motion for a directed judgment of acquittal was properly denied. State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967).
Affirmed.
NOTES
[1] Defendant was found not guilty of unlawful possession of a weapon, N.J.S.A. 2C:39-5b.
[2] We question how group bias can be found with regard to a non-cognizable group.