[Cite as *State v. DeLong*, 2025-Ohio-2432.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 23CA1171 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | <u>DECISION AND JUDGMENT ENTRY</u> |
| | : | |
| CLYDE DELONG, | : | |
| | : | RELEASED: 07/01/2025 |
| Defendant-Appellant. | : | |

<u>APPEARANCES:</u>

Max Hersch, Assistant Public Defender, Columbus, Ohio, for appellant.

Aaron Haslam, Adams County Prosecuting Attorney, West Union, Ohio for appellee.

Wilkin, J.

{¶1} This is an appeal from an Adams County Court of Common Pleas judgment entry that convicted appellant, Clyde DeLong ("DeLong"), of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree, as well as a firearm specification under R.C. 2941.145. On appeal DeLong asserts three assignments of error.

{¶2} In his first assignment of error, DeLong claims that when the trial court denied his request to strike the jury and continue his trial, it violated his right to a jury selected from a reasonable cross-section of the community in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Because DeLong cannot prove a prima facie case that the jury selection process was unconstitutional, we overrule his first assignment of error.

{¶3} In his second assignment of error, DeLong asserts that his trial counsel rendered ineffective assistance of counsel by seeking a self-defense instruction instead of an instruction that the shooting was an accident. Because we find that his trial counsel's failure to pursue accident as a defense was neither deficient representation or prejudicial to DeLong, we overrule his second assignment of error.

{¶4} In his third assignment of error, DeLong asserts that the trial court erred when it ordered his shotgun to be forfeited when the prosecution failed to include a forfeiture specification in the indictment and the jury did not determine whether it was subject to forfeiture. Because both parties agree with this assertion and that failure renders the forfeiture to be contrary to law, we sustain DeLong's third assignment of error and vacate the trial court's entry ordering forfeiture of DeLong's shotgun.

{¶5} Therefore, we affirm in part and vacate in part the trial court's judgment entry of conviction.

BACKGROUND

{¶6} The State charged DeLong with one count of felonious assault in violation of R.C. 2903.11(A)(2) a felony of the second degree, and two counts of involuntary manslaughter in violation of R.C. 2903.04(A), both felonies of the first degree. All three counts included firearm specifications pursuant to R.C. 2941.145. DeLong pleaded not guilty. The case was scheduled for trial.

{¶7} Immediately prior to trial, the court discussed two issues with the parties. The first was a motion in limine filed by the State to prevent DeLong

from claiming self-defense. Initially, the defense position was that the shooting was an accident. However, upon receiving and reading a report by Investigator Kenneth Dick, shortly before trial, and after consultation with DeLong, defense counsel intended to shift strategy from accident to self-defense. Defense counsel stated that it intended to call Investigator Dick and Chief Edgington in their case-in-chief to elicit testimony in support of asserting self-defense. The State ultimately withdrew its objection to DeLong raising self-defense.

{¶8} The second matter was defense counsel's "concerns regarding the composition of the venire." More specifically he believed that the venire was younger than the demographics in Adams County indicate. Counsel stated that he had "one [other case] where the composition of the, of the array, uh, the juror jury array was overwhelmingly in their, in the same age group, 20 to 29." Counsel was concerned that the jury had no one similar to DeLong with regard to age, who is "a 69-year old man with COPD and severe neuropathy." Counsel believed that it would be difficult to convey DeLong's situation to persons who have "probably never experienced anything like it." Counsel claimed that 18.5% of Adams County's population was 65 and older. Yet the jury array in this case had only three people in that age range. So he stated: "I just think there's a problem somewhere, either in the software or whatever's going on to, to draw that, that jury pool."

{¶9} There was a jury commissioner in the courtroom who answered some questions regarding jury selection. The commissioner confirmed that recently a change had been made regarding how potential jurors were selected. Originally,

they were selected only from registered voters. However, because persons were getting repeated calls to serve as a juror, motor vehicle registrants were added to the pool of persons from which potential jurors were selected. The last two draws came from this pool. Defense counsel claimed that the last three draws (this case and the prior two), which had occurred since January 1, 2023, were "overwhelmingly, uh, occupied by the age group of 20 to 29." The court stated that it did not disagree.

{¶10} In response, the State acknowledged that the pool was "primarily young[,]" but questioned whether it was systematic, suggesting it could be "a computer thing" or "dumb luck."

{¶11} The commissioner explained the Bureau of Motor of Vehicles ("BMV") provided 19,000 names that were incorporated into the case management system, and from those names and the names of the registered voters constituted the pool from which potential jurors are selected. The commissioner stated that the BMV's selection was random with the exception that persons who were not old enough to vote were excluded.

{¶12} Defense counsel objected to the composition of the jury venire and moved for a continuance because "the overwhelming representation of people that are here today are between the ages of 20 and 29." The court denied the motion.

{¶13} The trial commenced and the State presented seven witnesses. The State's first witness was Jeffery Bowling a deputy for the Adams County Sheriff's Department. Deputy Bowling responded to the shooting pertaining to

the charges filed against DeLong herein. When he arrived at the scene there was a body on the ground later identified as David Reedy ("Reedy"), who had a gunshot wound, and DeLong. DeLong identified himself as the shooter. Bowling took DeLong into custody. When asked by Bowling why he shot Reedy, DeLong claimed "[h]e, he has been stealing off of me and I told him not to come back here ever again." Bowling administered DeLong his *Miranda* rights. Deputy Bowling stated that DeLong was distraught.

{¶14} The State's next witness was Investigator Dick, who worked for the prosecutor's office in Adams County and part-time in the Adams County Sheriff's Office. The sheriff's office requested Dick to investigate this shooting. Once at the scene, Dick saw the deceased Reedy who was lying on the ground with a gunshot wound to his chest. Dick indicated the location of the shooting was on DeLong's property. Dick discovered DeLong's 12-gauge shotgun on the ground nearby. The shotgun was sent to the Bureau of Criminal Investigations ("BCI") for testing.

{¶15} Investigator Dick interviewed DeLong about the shooting. Investigator Dick testified that DeLong told him the day of the shooting that Reedy pulled into his driveway. DeLong told Dick that Reedy had stolen from him and so DeLong did not want Reedy on his property. DeLong went into his house and retrieved his 12-gauge shotgun and confronted Reedy and told him to stop, but Reedy continued up DeLong's driveway. DeLong said that he told Reedy again to stop, which he did and began to exit his truck. DeLong told Reedy to not get any closer or he would shoot. Investigator Dick testified that

DeLong stated that he and Reedy argued about whether Reedy had stolen from DeLong. Investigator Dick stated that DeLong told him that Reedy tried to grab the end of the gun several times, and at some point DeLong heard a boom, and the gun discharged shooting Reedy. DeLong called 911. DeLong confirmed that Reedy did not get out of the truck, other than his leg.

{¶16} DeLong told Investigator Dick that immediately prior to the shooting Reedy had nothing in his hands. Investigator Dick testified that DeLong did not indicate that he felt physically threatened by Reedy. However, DeLong had felt verbally intimidated by Reedy. Investigator Dick testified that there was no evidence of a weapon in Reedy's possession at the time of the shooting, although there was a hunting knife in his truck.

{¶17} The State's next witness was Debora Lindstrom, who is a criminologist in the toxicology section at the Ohio State Highway Patrol Laboratory in Columbus, who examines biological samples for the presence of controlled substances. She tested a urine sample from DeLong, which contained methamphetamine, as well as a metabolite that indicated marijuana use.

{¶18} The State's next witness was Dr. Anna Castiglione Richmond, who is a forensic pathologist. She was employed with the Montgomery County Coroner's office where she performs autopsies. She performed an autopsy on Reed and opined that he died from a shotgun wound to the left upper chest. She also testified that the toxicology report indicated methamphetamine was found in Reedy's system. The nature of the wound indicated that the shooting could have occurred at close range. The shooting was likely not more than a few feet away.

{¶19} The State's next witness was Andrea Wiesenberger, a forensic criminologist at BCI specializing in DNA analysis. She indicated that there was DNA found on the trigger of DeLong's shotgun that matched his DNA profile.

{¶20} The State's next witness was Kimmy Rodgers, Adams County Sheriff, who indicated that the 911 call from the shooting had been recorded. The State then played the 911 call. When asked why he shot Reedy, DeLong replied "he's been coming here and stealing, I just couldn't prove it." The dispatcher informed DeLong that law enforcement was on the way and to try to keep Reedy awake and control the bleeding.

{¶21} Sheriff Rodgers testified that DeLong told him that Reedy had been stealing methamphetamine from him. DeLong told the Sheriff that he was going to shoot someone if he caught them stealing. DeLong told the Sheriff that Reedy came to his house and DeLong accused Reedy of stealing from him and told Reedy to leave. DeLong threatened to shoot Reedy. Reedy refused to leave, and DeLong pointed the gun at Reedy who grabbed it and "it went off." DeLong did not mention that Reedy made any physical threats or had a weapon during the encounter.

{¶22} The video of the interview was then played for the jury. DeLong denied being on methamphetamine the day of the shooting. DeLong told the sheriff that when he shot Reedy he was in his truck with the door open.

{¶23} The State's next witness was Heather Ann Zollman, a forensic firearms examiner from BCI. She conducting testing on DeLong's shotgun. She successfully test fired the shotgun. To fire the shotgun required cocking the

hammer and pulling the trigger. Zollman also tested the shotgun for "inadvertent firing." She did a drop test, struck the shotgun with a rubber mallet, and conducting a "fan fire type test" (i.e., pulling back the hammer without pulling the trigger in an attempt to make it discharge). None of these tests resulted in the shotgun discharging, i.e., the shotgun could not accidently discharge. The State then rested.

{¶24} The defense recalled Investigator Dick, who after examining a photo of the interior of Reedy's truck, identified the handle of a knife sticking out between the seats with the blade concealed between the seats. Investigator Dick testified that when he interviewed DeLong regarding the shooting, DeLong said that he felt threatened by the "aggressiveness of the words that Mr. Reed was using." Investigator Dick stated that DeLong told him he retrieved his shotgun when Reedy appeared at his house because previously Reedy has stated to DeLong that if they got in a physical fight who knows who would win. Investigator Dick testified that DeLong believed his ill health, age, the fact that he had a prior heart attack, and that he'd been sick would contribute to his inability to defend himself from Reedy.

{¶25} The second witness for the defense was Chief Edgington of the Winchester Police Department. When the defense counsel asked the Chief if he knew Reedy, the State objected. The defense responded that the Chief's testimony pertaining to Reedy was pertinent to DeLong's claim of self-defense. The court overruled the State's objection. The Chief indicated that he had contact with Reedy on June 22, 2022 regarding a domestic violence situation.

The Chief said that Reedy indicated that a female had stolen a radio from his truck, but he said everything was okay. The Chief asked Reedy if he wanted a deputy to make a report on the theft, but Reedy said that he would "take care of [her]."

{¶26} Sergeant Newland a detective for the Adams County Sheriff's office, who investigated this case, testified next for the defense. However, he, at most, corroborated previous testimony, e.g. he testified that there was a knife stowed between the seats in Reedy's truck with only the handle showing.

{¶27} The last witness for the defense was DeLong. On June 23, 2022, he went to visit Reedy's neighbor, Vic, and explained that Reedy was "ripping everybody off." DeLong showed Vic how one bag of Methamphetamine was lighter than the other. Then, Reedy came over to Vic's house and verbally threatened DeLong, so DeLong departed and went back home. However, prior to leaving he told Reedy, "don't ever show up on my doorstep ever again."

{¶28} Sometime after 3:30 p.m. that day, DeLong was sitting on his porch with his brother, Patrick, when Reedy pulled into his driveway, which is about 250 to 300 feet long. DeLong asked Patrick to tell Reedy to leave, and then DeLong went into his house. However, Patrick never asked Reedy to leave. DeLong retrieved his shotgun because he was "afraid" of being physically harmed or killed by Reedy. DeLong believed that Reedy was stronger then he was. He was concerned because earlier in the day Reedy had indicated that he "would take care of business" with "anybody that was messing with his customers."

{¶29} DeLong claimed that he did not cock his shotgun.  As he was walking to the edge of his driveway he encountered Reedy heading right toward him.  DeLong told Reedy to stop and leave, but Reedy continued toward DeLong.  Reedy eventually stopped his truck, and DeLong, who was standing even with the truck's front fender, again told Reedy to leave.  Reedy did not leave but instead opened the door of his truck, moved his leg out the door, and placed his foot on the ground.  DeLong asserted that he was "shaking" the gun at Reedy, who grabbed the barrel through the window of his truck, jerked it, and the gun went off.  The defense rested.

{¶30} The State renewed its objection to the court instructing the jury on self-defense.  The State opined that DeLong had not introduced any evidence to support a self-defense instruction, but if a self-defense instruction was permitted there could be no instruction on accidental discharge.  The Court concurred.  Defense counsel informed the judge that exercising self-defense was a "discussion we've had with Mr. DeLong more than once[,]" and "that is what we're electing to do."  The court indicated that it would provide a self-defense instruction, but not an instruction on accidental discharge.

{¶31} During its closing, the State argued that DeLong knowingly caused or attempted to cause harm to Reedy with a deadly weapon when he discharged the shotgun toward him.  The State argued that DeLong could not prove self-defense.  The State claimed that DeLong had no reasonable belief that he was facing an imminent threat of death or serious bodily injury that is required for self-defense and asked the jury to find DeLong guilty.

{¶32} Defense counsel argued that Reedy did believe that he was in imminent danger of serious bodily injury or death so self-defense should apply. Therefore, counsel argued, DeLong should be found not guilty.

{¶33} The jury found DeLong guilty of felonious assault and both counts of involuntary manslaughter, as well as the accompanying firearm specifications. At sentencing the court found that all three offenses were allied offenses of similar import and therefore merged them under R.C. 2941.25. The State elected to have DeLong sentenced for count one, involuntary manslaughter and the accompanying firearm specification. The court imposed an indefinite prison term of 9 to 12 years in prison.

{¶34} It is this judgment of conviction that DeLong appeals.

A

ASSIGNMENTS OF ERROR

I.      WHEN THE TRIAL COURT DENIED CLYDE DELONG'S
        REQUEST TO STRIKE THE JURY AND CONTINUE HIS TRIAL, IT
        VIOLATED HIS RIGHT TO A JURY SELECTED FROM A
        REASONABLE CROSS-SECTION OF THE COMMUNITY.

II.     MR. DELONG'S TRIAL COUNSEL RENDERED INEFFECTIVE
        ASSISTANCE OF COUNSEL BY PURSUING A SELF-DEFENSE
        THEORY INSTEAD OF ACCIDENT.

III.    THE TRIAL COURT ERRED WHEN IT ORDERED MR.
        DELONG'S SHOTGUN TO BE FORFEITED WHEN THE
        PROSECUTION FAILED TO INCLUDE A FORFEITURE
        SPECIFICATION IN THE INDICTMENT AND THE JURY DID NOT
        DETERMINE WHETHER IT WAS SUBJECT TO FORFEITURE.

I. First Assignment of Error

{¶35} DeLong argues that the jury-selection process used by Adams County to construct the jury venire violated DeLong's right to a jury selected from

a fair cross-section of the community pursuant to the Sixth and Fourteenth Amendments. Specifically, the method used excluded elderly persons from jury service because of their age. DeLong claims that "to establish a prima facie violation of the fair-cross-section requirement, the defendant must show[:]" (1) the excluded persons are from a distinctive group, (2) the representation of that group was not fair and reasonable, and (3) that group was systematically excluded from the jury-selection process. If a prima facie case is established, then the burden shifts to the State to show that the infringement on the fair cross-section is necessary for a significant state interest.

{¶36} DeLong acknowledges that whether the elderly is a distinct group is an issue of first impression in Ohio, but claims that they are a distinct group. He cites one Alabama criminal appeals case from 1976 that found persons over the age of 65 were an identifiable group for purposes of being excluded from the "jury roll." *See Williams v. State*, 342 So.2d 1325.

{¶37} DeLong claims that a group is distinct for purposes of determining whether jury selection is constitutional if the group "is a recognizable, distinct class, singled out for different treatment under the laws, as written or applied." *See Castaneda v. Partida*, 430 U.S. 482, 494 (1977). DeLong notes that in Ohio there are increased punishments for the offender when the victim of a crime is over 65 pursuant to R.C. 2931.01(CC). He also asserts that Ohio and federal law recognize age discrimination in employment against persons who are over 40 years old. Thus, he claims that he has satisfied the first prong of the test, i.e., "elderly" persons are a distinct group.

**{¶38}** DeLong next claims that that the representation of the elderly was not fair and reasonable. "No elderly individuals sat on Mr. DeLong's jury. And the jury venire included, at most, three individuals over 65 years old—possible as few as one." "As of 2021, 18.5% of Adams County was 65 years of age or older[;]" therefore, DeLong argues that the representation of elder individuals in his jury venire was not fair and reasonable.

**{¶38}** Finally, DeLong maintains that the exclusion was systematic because it was inherent in the jury selection process used. DeLong claims that the court, defense, and prosecution agreed that the method used by Adams County to construct the venires resulted in overrepresentation of persons in their twenties. This, he claims, was "likely the result of using driver's-license numbers or date of birth as the method by which the motor-vehicle registrants are narrowed to those called for jury duty." Therefore, the third prong of the test is satisfied.

**{¶39}** Having shown a prima facie case that the jury selection was unconstitutional, DeLong argues there is no significant state interest served by the method that Adams County used to construct jury venires. Therefore, the methods used by Adams County to pick the jury venires violates DeLong's right to have a jury that is representative of a reasonable cross-section of his community. Accordingly, his conviction should be reversed.

**{¶40}** In response, the State agrees that the three-prong test cited by DeLong is applicable to this issue, and if a prima facie case is established the State must demonstrate that the limitation on the fair cross-section is essential

for a significant state interest.   However, the State argues that DeLong's counsel objected to the jury on the basis that the jury pool did not accurately represent the entire community.  The law does not provide the right to a jury of a particular composition.  Accordingly, DeLong's constitutional challenge fails.  His first assignment should be overruled.

A. Law and Analysis

{¶41} The Sixth Amendment guarantee to a jury trial "contemplates a jury drawn from a fair cross-section of the community." *State v. Bryan*, 2004-Ohio-971, ¶ 111, quoting *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). However, there is " 'no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition[.]' " *Id.* quoting State *v. Johnson,* 88 Ohio St.3d 95, 117, 2000-Ohio-276, quoting *Taylor,* 419 U.S. at 538.  However, " 'the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.' " *Id.*

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

**{¶42}** "Appellant's failure to point to any evidence supporting a *prima facie* violation of the fair cross-section requirement defeats this claim." *State v. Elmore*, 2005-Ohio-5940, ¶ 57, citing *United States v. Allen,* 160 F.3d 1096, 1103-1104 (6th Cir.1998).

**{¶43}** However, "[t]he demonstration of a prima facie fair-cross-section violation by the defendant is not the end of the inquiry into whether a constitutional violation has occurred." *Id.* at 367. "The State [then] bears the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." *Duren* at 368. The Court in *Duren* "explained that 'States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community.' " *Id.*, citing *Taylor*, 419 U.S. at 538. However, those qualifications "require [ ] that a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process[.]" *Id.*

1. Distinctive Group

**{¶44}** "Exactly what constitutes a 'distinctive group' is a rather amorphous concept in that the Supreme Court has not burdened the term "distinctive group" with a precise definition." *Silagy v. Peters*, 905 F.2d 986, 1010 (7th Cir. 1990), citing *Lockhart v. McCree,* 476 U.S. 162, 174 (1986). Aside from *Williams*, 342 So.2d 1325, a Court of Criminal Appeals in Alabama from 1976, DeLong cites no case that holds that age can define a distinctive group for purposes of the Sixth Amendment, and our research yields no others.

**{¶45}** Rather, every other case that we have found where a party has argued that some certain age group is distinctive for purposes of administering the test from Duren, the courts have declined to do so.  The Sixth Circuit Court of Appeals has opined that "if an age classification is adopted, the door would be opened to countless other 'distinctive groups.' " *Ford v. Seabold*, 841 F.2d 677, 682 (6th Cir. 1988).  Similarly, the First Circuit Court of Appeal found that

> Unless one is prepared to say that there is an affirmative constitutional duty to produce a true cross section on the venire for every imaginable group that exists in our complex society, something which no court has even come close to holding, we should avoid the overwhelming problems and sterile solutions that will result from attempting to subdivide a continuum of ages into "distinctive groups."

*Barber v. Ponte*, 772 F.2d 982, 1000 (1st Cir. 1985)

Consequently, "every circuit faced with the question has held that an excluded age category was not a distinctive group for Sixth Amendment purposes." *Brewer v. Nix*, 963 F.2d 1111, 1113 (8th Cir. 1992), citing *Silagy,* 905 F.2d 986, 1009-11 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991) (age 70 and over); *Wysinger v. Davis,* 886 F.2d 295, 296 (11th Cir.1989) (age 18-25); *Ford,* 841 F.2d 677, 681-82 (6th Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988); *Barber v. Ponte,* 772 F.2d 982, 996 (1st Cir.1985) (en banc), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986) (age 18-34); *United States v. Potter,* 552 F.2d 901, 905 (9th Cir.1977); *United States v. Kirk,* 534 F.2d 1262, 1278 (8th Cir.1976).  We agree with the holding and logic of these federal cases and decline to recognize that elderly individuals are a distinctive group.

**{¶46}** Furthermore, DeLong also argues that his poor health/frailness is as much a reason why younger individuals could not identify with him. However, poor health/frailness is not exclusive to older individuals. Younger individuals can suffer from such infirmities as well. This further dilutes DeLong's argument that he is truly seeking a distinctive group based solely on age and would arguably expand his proposed distinct group beyond just the elderly he is looking to recognize.

**{¶47}** Accordingly, we reject DeLong's argument that elderly persons are a distinct group for purposes the Sixth Amendment.

### 2. Systematic Exclusion

**{¶48}** DeLong claims that elderly persons are underrepresented in his jury compared to the elderly population of Adams County. During a discussion with the court, both counsels, and a jury commissioner, it appears that the disparity had first shown up in January of 2023, and had occurred in a total of three venires up to the date of DeLong's trial. However, as we stated, this was a brief informal discussion, not a hearing where any evidence was presented, and except for defense counsel's recitation of various figures, the court, prosecutor and jury commissioner seem to be going from memory. In other words, it is not completely clear how reliable these representations are for assessing the jury selection process used by Adams County.

**{¶49}** However, even assuming the statements were dependable and elderly persons were underrepresented in three jury venires, "[t]o be systematic, the exclusion must be more than occasional or isolated; it must be a consistent

and pervasive issue within the jury selection process.  Underrepresentation in a single venire is not *systematic* exclusion." (Italics original).  *State v. McNeill*, 1998-Ohio-293, 83 Ohio St. 3d 438, 444, citing *Ford v. Seabold*, 841 F.2d 677, 685 (Sixth Cir. 1988).  "[T]he degree of underrepresentation must be proved . . . over a *significant* period of time."  (Emphasis added.) *Castaneda v. Partida*, 430 U.S. 482, 494, citing *Hernandez v. Texas*, 347 U.S., at 478-479.  For example, where underrepresentation occurred in the venire every week for a year, the exclusion is systematic.  See *Duren,* 99 S.Ct. at 669, 58 L.Ed.2d at 588.

**{¶50}** Even assuming elderly persons were underrepresented in three venires, we find that is insufficient to meet the threshold of being systematic exclusion.  Therefore, we reject DeLong's argument that any underrepresentation of elderly persons was systematic.

**{¶51}** Since DeLong has not provided enough evidence to satisfy at least two of the three elements of the Duren test, he has not established a prima facie case that the jury selection process was unconstitutional.  Therefore, we overrule his first assignment of error.

## II. Second Assignment of Error

**{¶52}** In his second assignment of error, DeLong asserts that his counsel was ineffective for pursuing self-defense rather than accident as a defense. DeLong maintains that he was prejudiced by his counsel's ineffectiveness because at least one juror could have found that he did not knowingly shoot Reedy and he would not have been convicted.

{¶53} DeLong argues that his counsel did not employ a reasonable trial strategy by arguing self-defense.  A person is not entitled to pursue self-defense unless they concede the elements of the offense.  DeLong claims that there was no such concession in his case.  DeLong consistently maintained that the shotgun fired accidentally."  Consequently, by asserting self-defense he was asking the jury to disbelieve his statements that he did not knowingly fire the shotgun at Reedy.  In other words, DeLong's statements were incompatible with his self-defense theory as a matter of law.

{¶54} DeLong further claims that no reasonable juror could have found that the prosecution failed to prove the lack of self-defense.  While DeLong argues that he had no obligation to retreat because he was on his own property at the time of the shooting, the evidence overwhelmingly showed the absence of the other elements of self-defense.

{¶55} After retrieving his shotgun from his house, DeLong approached Reedy.  He knew Reedy was unarmed as he stepped out of his truck.  Self-defense would have required that DeLong acted knowingly. Therefore, if the jury were to assume that DeLong acted knowingly when he fired the gun, no reasonable juror could have found that DeLong was not the initial aggressor. And Reedy's earlier verbal threat to DeLong was not sufficient to justify use of deadly force.  Therefore, DeLong posits, neither Reedy's earlier threat nor Reedy's conduct in stepping out of his truck could have established that DeLong was in fear of imminent danger of death or serious injury, so self-defense would not apply.

{¶56} Thus, DeLong argues, because his counsel pursued self-defense, he (DeLong) was foreclosed from arguing that that the shooting was an accident because an accident negates that the shooting was done knowingly. And DeLong maintains that if even one juror believed his testimony that the shooting was accidental, then there is a reasonable probability that the outcome of DeLong's trial would have been different. But because DeLong's counsel argued self-defense, he could not argue that the shooting was an accident.

{¶57} In response, the State claims that DeLong and his counsel collaborated and decided to argue self-defense. The State notes that DeLong called three witnesses: Investigator Dick, Chief Edgington, and DeLong to establish that a self-defense instruction was warranted.

{¶58} The investigator interviewed DeLong about the shooting. He testified that DeLong told him that although Reedy was not holding anything at the time of the shooting, Reedy's words and aggressive tone made him feel uneasy. The investigator also asked DeLong about retrieving his shotgun, and although he could not recall DeLong's exact response, it implied that previous encounters he had with Reedy lead DeLong to be uncertain about the outcome if they had a physical altercation. The investigator indicated that DeLong believed that his shotgun would be a deterrent to a physical altercation.

{¶59} The State claims DeLong testified that based on his physical limitations, he was concerned about having a physical fight with Reedy, including his poor health, his advanced age, and the fact that he recently suffered a heart attack.

**{¶60}** The State further asserts that Chief Edgington testified that he encountered Reedy on June 22, 2022. Reedy explained to the Chief that he believed a radio had been stolen from his truck.  The Chief offered for a deputy to file a stolen property report on Reedy's behalf, but Reedy declined stating that he would handle the situation himself.

**{¶61}** The State also asserts that DeLong testified on the morning of the shooting that he went to visit Reedy's neighbor and warned the neighbor about Reedy's dishonest actions of cheating people.  To prove this assertion, DeLong "showed the neighbor two empty bags which had previously contained methamphetamine, noting a significant weight difference between them."  Reedy came over to the neighbor's house while DeLong was still there and threated DeLong.  And DeLong told Reedy "don't ever show up on my doorstep again."

**{¶62}** The State maintains that pursuant to the aforementioned testimony, DeLong's counsel established a foundation for the trial court to instruct the jury on self-defense, which it did.  Therefore, DeLong's trial counsel's representation of DeLong was not deficient.  Merely because that strategy was unsuccessful does not mean that his counsel was ineffective.

### A. Law

**{¶63}** "The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense."  *State v. Hughes*, 2025-Ohio-894, ¶ 52 (4th Dist.).  "The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the

'reasonably effective assistance' of counsel."  *Id.*, citing *Strickland v. Washington*, 466 U.S. 668.

**{¶64}** To prove ineffective assistance of counsel, a petitioner "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different."  *State v. Short*, 2011-Ohio-3641, ¶ 113 (4th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984).  Therefore, "[f]ailure to establish either element is fatal to the claim."  *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.).

**{¶65}** "To establish prejudice, a defendant must demonstrate that a reasonable probability exists that but for counsel's errors, the result of the trial would have been different."  *State v. Walters*, 2014-Ohio-4966, ¶ 24 (4th Dist.), citing *State v. White,* 82 Ohio St.3d 15, 23 (1998).  " '[S]peculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim.' "  (Brackets original) *Id.*, quoting *State v. Blackburn*, 2020-Ohio-1084, ¶ 37 (4th Dist.).

**{¶67}** "In Ohio a properly licensed attorney is presumed competent." *State v. Ruble*, 2017-Ohio-7259, ¶ 47 (4th Dist.), citing *State v. Gondor*, 2006-Ohio-6679, ¶ 62.  "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation."  *State v. Conway*, 2006-Ohio-2815, ¶ 95. When considering whether trial counsel's representation amounts to deficient performance, "a court

must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 689.

{¶68} "Generally, the decision regarding which defense to pursue at trial is

a matter of trial strategy, and trial strategy decisions are not a basis of a finding

of ineffective assistance of counsel." *State v. Craver*, 2020-Ohio-5407, ¶ 29 (2d

Dist.), citing *State v. Moss*, 2008-Ohio-6969, ¶ 35 (2d Dist.), citing *State v.*

*Murphy*, 91 Ohio St.3d 516, 524 (2001).  It is well settled that debatable strategic

and tactical decisions may not form the basis of a claim for ineffective assistance

of counsel, even if a better strategy is available.  *State v. Stodgel*, 2024-Ohio-

5182, ¶ 46 (4th Dist.), citing *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995).

"Hindsight is not permitted to distort the assessment of what was reasonable in

light of counsel's perspective at the time, and a debatable decision concerning

trial strategy cannot form the basis of a finding of ineffective assistance of

counsel." *State v. McKenzie*, 2021-Ohio-536, ¶ 22 (4th Dist.), quoting *State v.*

*Detienne*, 2017-Ohio-9105, ¶ 35 (4th Dist.).

R.C. 2901.05(B)(1) provides:

> A person is allowed to act in self-defense . . . If, at the trial of a
> person who is accused of an offense that involved the person's
> use of force against another, there is evidence presented that
> tends to support that the accused person used the force in self-
> defense  . . . , the prosecution must prove beyond a reasonable
> doubt that the accused person did not use the force in self-
> defense . . .

{¶69} "Self-defense 'does not merely deny or contradict the evidence

offered by the State, but rather *admits the prohibited conduct* while claiming that

surrounding facts or circumstances justify the conduct.' " (Emphasis added.)

*State v. Murphy*, 2010-Ohio-5031, ¶ 60, citing *State v. Walters,* 2007-Ohio-5554, 36 ¶ (10th Dist.), quoting *State v. Brown,* 2005-Ohio-4502, ¶ 14 (7th Dist.). Conversely, asserting the defense of accident " ' "is that which is unintentional and unwilled and implies a lack of criminal culpability" ' " *State v. Suffel*, 2015-Ohio-222, ¶ 39 (3rd Dist.), quoting *State v. Vintson,* 2007-Ohio-6141, ¶ 31 (9th Dist.), quoting *State v. Ross,* 135 Ohio App.3d 262, 276 (12th Dist.1999).

### B. Analysis

**{¶70}** DeLong testified that he was " 'shaking' the gun at Reedy, who grabbed the barrel through the window of his truck, jerked it, and the gun went off." However, as the defendant in this case and the sole witness to the shooting, the credibility of this testimony was an issue for the jury to decide. DeLong's credibility was further strained because during his interview with the sheriff he stated that the shotgun was not cocked and his finger was not on the trigger prior to shooting Reedy. Yet the State's firearm expert testified that DeLong's shotgun could not be discharged unless it was cocked and the trigger pulled. Finally, the evidence also showed after Reedy drove into DeLong's driveway, Delong entered his house, retrieved his shotgun, exited the house, proceeded down the driveway, and pointed the barrel of the shotgun through the window of Reedy's truck. We find that collectively this evidence could support the conclusion that DeLong intentionally shot Reedy, which would mean that self-defense would have been a permissible defense strategy, but not accident. Therefore, defense counsel's strategy to choose self-defense over accident, was at worst a debatable strategy, which "may not form the basis of a claim for ineffective

assistance of counsel, even if an alternative strategy would have been a better choice." *Stodgel*, 2024-Ohio-5182, ¶ 46 (4th Dist.). Accordingly, we find that defense counsel's decision to argue self-defense, as opposed to accident, was not deficient representation.

**{¶71}** Even assuming defense counsel's representation was deficient for not pursuing the strategy of accident as a defense, we find it speculative at best that but for that choice there was a reasonable probability the result of DeLong's trial would have been different, i.e., that he would not have been convicted of involuntary manslaughter. As we discussed in the prior paragraph, despite DeLong's testimony there is evidence that supports that the shooting was intentional.

**{¶72}** Therefore, we find that DeLong's trial counsel's representation of DeLong was not deficient, but even if it was, it did not prejudice DeLong. Accordingly, we overrule DeLong's second assignment of error.

### III. Third Assignment of Error

**{¶73}** In his third assignment of error, DeLong asserts that the trial court erred when it ordered his shotgun to be forfeited because the indictment did not include a forfeiture specification and the jury did not determine whether the firearm was subject to forfeiture.

**{¶74}** The State acknowledges that DeLong's indictments did not include a forfeiture specification for his shotgun and absent the specifications there was no authority for the court to order its forfeiture. Therefore, the State requests this court reverse and vacate the forfeiture.

**{¶75}** Consistent with the parties' agreement, courts have no authority to order the forfeiture of property if the State fails to include forfeiture specification in the indictment. *See State v. Humphrey*, 2022-Ohio-2456, ¶ 10-11 (12th Dist.).

**{¶76}** R.C. 2953.08 (G)(2) provides that upon hearing an appeal,

> [t]he appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
> . . .
> (b) That the sentence is otherwise contrary to law.

**{¶77}** Ordering forfeiture of property as part of a sentence is contrary to law if the State did not include a forfeiture specification in the indictment or information charging the offense. The parties agree that the court ordered DeLong's shotgun forfeited even though there was no forfeiture specification in the indictment. Therefore, the forfeiture of the shotgun was contrary to law. To promote judicial efficiency, pursuant to our authority in R.C. 2953.08 (G)(2), we vacate the trial court's order for DeLong to forfeit his shotgun.

### CONCLUSION

**{¶78}** We overrule DeLong's first two assignments of error. We sustain his third assignment of error and vacate the forfeiture of DeLong's shotgun.

**JUDGMENT AFFIRMED IN PART AND VACATED IN PART.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND VACATED IN PART and the appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Kristy S. Wilkin, Judge


## **NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**